Good morning, and may it please the court. Alejandro Martinez was merely trying to walk home on the correct side of the road when Officer Cantu initiated the unfounded and ill-fated stop at issue here. Once the stop was initiated, Officer Cantu did not even indicate that Mr. Martinez was under arrest, before rapidly escalating to an excessive use of force to take down and handcuff the elderly and injured Mr. Martinez. With that in mind, Appellant has three main points. First, even if the arrest itself had been justified, the speed of the escalation of force and the amount of force used was clearly and objectively unreasonable to the need in the face of a non-violent and physically vulnerable arrestee in Mr. Martinez. Second, the arrest itself was never justified in the first place, as Cantu never witnessed Mr. Martinez walking on the wrong side of the road, never told Mr. Martinez that he was under arrest, and did not give Mr. Martinez an opportunity to speak. Well one of the dash cams, I mean when, I can't remember which officer, but one of the dash cams when he first starts talking to Mr. Martinez, he's on the quote wrong side of the road when that conversation occurs, right? Mr. Martinez says, you know, I just crossed the street, I just crossed the road, so when that dash cam is showing, it's showing him on quote the wrong side of the road or whatever when he's actually talking to him, isn't that right? Well, so they talk about, you know, crossing to the correct side of the road, and it's because the whole, and kind of the whole video starts where they're at the T intersection, and from Mr. Martinez's perspective. The 552 violation is based on Parrott Street, not the Fifth, right? Correct, correct. So he was on the right side of Parrott at the corner of Fifth and Parrott, so he had, according to him, crossed from the left side of Parrott to the right side to that corner so that he could then cross to the left side of Parrott and continue down toward his home. That, to appellant's knowledge, and according to the Texas traffic code. The problem, of course, is the video just on the wrong side for about six seconds, correct? It's not that he diagonally crossed to the corner, he walked five or six seconds on the wrong side of Parrott. So that's what the district court found, that's what. I know, but that's the video, right? You disagree? I do disagree because the video and appellee provided, the appellees, excuse me, provided some screenshots at ROA 406 through 412 of those six seconds that you're referring to. And you can see at the beginning of those six seconds where the corner is, it kind of starts to fall away from where he's walking. So I mean, we're talking about the actual corner of the intersection here, we're not talking about along the road, we're talking about at the intersection. And you can see by the end of the six seconds he's turned in his crossing to the left side of Parrott where he's required by the traffic code to walk down the street. I guess, as I understand the traffic code, the pedestrians got to walk past 5th, then could walk across it. At that point, the person would never be walking on the wrong side. You know what I mean? That would be the only way to comply under the state's theory. You'd have to walk past the intersection and then straight across. And at that point you'd be on the left side each time. Yeah, under that theory, yes. But the traffic code provides for crossing, you know, as long as it's not diagonal, as long as it's perpendicular. Okay, if it's perpendicular and exactly perpendicular, you'd be okay too. So what I'm saying, I guess what I'm saying is two perpendicular crossings instead of one doesn't violate the traffic code to my knowledge. He's not walking along the wrong side of the road to make those two perpendicular crossings. There's no sidewalk, and you didn't argue below that it was unsafe to be on the side that you're supposed to be on, did you? Correct. Even though there is a ditch there. Yeah, there is a ditch on that left side, that is correct. And that certainly could have played into the decision to cross perpendicular to that side of 5th before then making the two perpendicular crossings instead of one. I watched all the dash cams, I mean, and the body cams, and my initial question was I thought you were saying the officer never saw him on, quote, the wrong side of the street. Maybe I misunderstood what you said. Yeah, what I was saying in that argument is exactly what I'm saying here, which is, you know, the dash cams don't show, and the dash cams show from the moment that Officer Cantu turns on the parent. So we can see what Officer Cantu can see from pretty early on. And that is that he's not, instead of walking along that side of the road, that he's at the corner making a crossing. So that's the distinction that I'm trying to pull here, is, you know, walking along versus crossing. And if I may use a personal example, I mean, I have a one-year-old daughter, she just turned one on Friday. We go for walks all the time in our neighborhood. We also don't have sidewalks. So this is a situation that I face, I'm sure we all have faced, of, you know, when to cross, how to cross, how to do so safely. And, you know, each particular instance, especially because I face the same instance where there's a T intersection with a feeder road and then a smaller residential street. So especially when you're in these situations where there's a slightly busier feeder road, you want to cross when there's ample opportunity, when it's very safe for yourself, very safe for the cars around you. So if that means crossing twice instead of once, me as a father who, you know, I'm looking out for the safety of my daughter, I'm always crossing when it's the best, the safest opportunity, even if that means making two crossings instead of one, if that makes sense. But I'd like to turn back to, if I may, the excessive force component of this case. So we have, obviously, the false arrest, but, and we can come back to that. But even, even assuming that the, that, that initial... Let me ask you a question about the Texas Transportation Code, the 552 provision 006, whatever. What does it provide for a violation of the code? What, you know, the, the, the Texas Transportation Code makes this requirement that's at issue here. What's the penalty, if any, for violating it? So, I mean, it's, it's the same penalty as, as any moving traffic violation. He, he could be ticketed, but... And what is that? What do you mean? Well, a moving traffic violation, you, you get fined for, that's your speed, one thing or another. That's a whole range of things. In other words, they, the officers are arresting him. Is it, is it a jail offense out of the code, or is it just a fine? So typically it's just a fine, but under, under Texas law, arrests or detentions can be made for, for traffic violations under certain circumstances if, if the officer deems. And what are those? I don't have those in front of me, Your Honor. What are those? Those weren't specifically at issue, so if, if... No, what, what I'm trying to get to is for the conduct that's here. Right. The, the, if, if he had not, let me argue he didn't comply, but what, what, what could he have done to comply? Your Honor, comply with the traffic code or, or comply with the officer? Well, what happens here, he, he, well, police officers stop him, and then there's some kind of encounter, and he, and it gets out of hand. But, but let us, let's just suppose that he was docile and nothing of that capital. What follows from this violation? How is it enforced? So in, in a, in a typical instance, if, if Mr. Martinez... Is it a citation, or what? Yeah, it would be a citation, exactly. It'd write a, okay. Well, what other section of law moves it from a, beyond a citation? Your Honor, I don't have the answer to that in front of me. But again, because this issue wasn't briefed, it would be something that we could certainly discuss in supplemental briefing if necessary. But, and that's... I'm just trying to get a sense of what the statute does. If I'm driving and I get, and I'm pulled over because I, I didn't, I've had a rolling stop or whatever, and I'm virtually docile, so can you arrest me and take me to jail? Your Honor, I, usually there, usually in, in, in the sorts of, of instances where a traffic violation turns into an arrest, there is some sort of, of escalation that happens, and that, and that's where the use of force kicks in as well, is, is the escalation from a basic fine, a basic traffic fine. I understand that. But, but there also is a distinction between, as to the enforcement mechanisms of, of, of the statute, whether it is an arrestable offense or a citation offense. And they give you a ticket for it, but it's not arrestable. I think they can arrest you and take you to jail if you're cooperative and so forth. And now, you say this is all traffic violations, rolling stops. I would think you'd be saying that's a lot more dangerous under the Graham factors. If someone's in a car and they're intoxicated like Solis, or there's a rolling stop and they might hit a pedestrian, that's a more severe offense. It might be an arrestable offense. I think perhaps what Judge Higginbotham's asking, is this like jaywalking? No one's in any danger of anything. You're going to get a little fine. But escalating based on this crime and no threat and no resistance, so it's sort of asking you to tell us, what's the law that was clearly established that Officer Cantu violated when he took your client down for this offense? Right. So. Is it a dangerous traffic offense or is it a pedestrian citation type offense? It's a pedestrian citation type, type offense. And that's, yeah, what, what, what we're getting at is that, you know, it's, it's typically a small fine. It's typically, you know, a small offense. It's not dangerous. Even the district court agreed that, you know, looking at the Graham factors, the first two factors, the severity of the offense and the, the immediate safety of the officer that are. Trouble, of course, is cases like Solis, where the court says, even though those two factors favor your client, we're still not going to say gets past summary judgment because hands up, stepping back, officer had to do something. That, right? Isn't that the logic of the, of the position here? And how do you respond to that? Right. So the, the logic of the position that, that the officer had to do something, I would turn the court's attention to Joseph versus Bartlett and, and its explication of the Graham factors where it wants to, where the court looks for a measured and ascending response. So we go from, um, the, the timestamps in the, uh, dash cam video are at, uh, 435, 11 to 436, 23. That's a minute and 12 seconds from when the talking starts, when Cantu is pulled over and begins talking to Mr. Martinez to the time that Mr. Martinez is taken, taken down. Now the officer, the officer's going to, as I understand it, testify that, that he stepped, he was talking to him and he backed away from him and then, then to detain him, I suppose, then he handcuffed him. Correct. And, and the, the, the video shows that, that they're sort of moving together and apart, um, on and off, uh, during the encounter. Um, but the, the key there is, is the measured and ascending, um, and the speed of the escalation. So it's a minute and 12 seconds of talking. The last three seconds of that are, uh, the decision to take down Mr. Martinez, uh, to the ground and affect the arrest. Um, and, and the reason that, that the takedown was not measured and ascending is because there was no attempt to handcuff Mr. Martinez or, or do any form of, um, what about the lower saying the officer Cantu is going to come to me and he refuses. So it's always, it's a little more difficult when someone there probably calls to arrest, refuses a direct door. So in, in the, in the use of force analysis that, that is relevant, but again, uh, the, the speed of escalation and the fact that, uh, yeah, he was saying no, the, he was still turned toward the officer. They were still, he, he wasn't fully turned walking away. There's no flight, I agree. Right. And he had turned and walked back toward the officer at one point. And it was clear that, that they were disagreeing. He was saying passive resistance. What's your case that is your strongest case that this is objectively unreasonable force to take them down? What's your best case? Preferably fifth circuit. Exactly. So, uh, the, the, the first case that I'd point to is Goodson versus city of Corpus Christi. That's 202 F third seven 30. Um, where we, we also see an injury, uh, that, uh, that is aggravated and isn't taken to account. And we also see that, um, the plaintiff in that instance was not given time to comply that he was asked to put his hands on the police car that, that wasn't even an option for Mr. Martinez here. He wasn't asked to give himself up to be handcuffed. He wasn't asked to put his hands on the car or anything like that. It goes from talking to being taken down without anything in between. There was no measured and ascending, um, escalation in between that. One of the code, if he had been perfectly cooperative, um, they, um, they, the officers nonetheless could have, could have arrested him and taken him to jail. If he had been, again, that, that's an issue that, that I don't want to speak too confidently about without doing some more research, Your Honor. Um, the, uh, the other case that I'd like to point the court to is Trammell versus Ferge, which, uh, talks, it's one of the number of cases that talks about how in a traffic stop in any kind of stop like this, uh, where the arrestee is not threatening, uh, is not fleeing, is not resisting that, uh, escalation, especially in escalation at speed is an objectively unreasonable use of force. Uh, so with that, my time has expired. Um, I'll save the rest for rebuttal. Thank you, Your Honors. Thank you. Mr. Selby. May it please the Court, Steve Selby for, um, the Appellees, the City of Rosenberg and all of the individual officers. Judge Higginbotham, if, if I could, um, to, to answer your question, the, the, the authority really is a constitutional authority and it, and it comes from the, the soccer mom case, um, Atwater versus City of Lago Vista, which is a United States Supreme Court case, which came out of Texas and it was actually a, a, a mom on her way to a soccer game, didn't have either herself or her, her child seat belted and, um, and a, and, and a police officer stops her and she wants to get to the game and she's not really cooperating and is resisting and, um, and, and eventually the officer arrested her and took her to jail for a, for a seat belt violation. And, and the United States Supreme Court said that, that it is not a constitutional violation to arrest a person for a, a fine only offense under the Texas Transportation Code. I, I, I, I hope that that answers your question. And, and, and let me say this. I'm familiar with that doctrine. My question is more, was more specific about what this particular statute provides, um, at, um, at the traffic code. Um, um, but I, I won't hold you up further on that, on that. So to comply with the law in a residential area during the daytime, coming up to an intersection, what's the, what's the sort of perpendicularness that a pedestrian's got to do to not get arrested? Well, I, Your Honor, I, I have to say that with, with, with due regard to comity in, in this situation, the, the plaintiff's interpretation of the path of travel of, of the plaintiff as shown in the video is disingenuous at best and, and borders on the absurd at, at, at worst. You can clearly see that at, um . . . Yeah, no, we have the video. I'm sorry. Yeah, I . . . If, if I'm Mr. Martinez walking along during the daytime, what do I have to do? I have to walk up exactly to the corner and then cross, or else I'm going to get arrested? I, I, I think, I think, I'm going to answer your question, but let me first say, I, I think that, that Officer, that Officer Cantu's vision is for, for seven or eight seconds, he is, he is walking on parrot against traffic before he ever gets to fifth. Right. And, and then in the, in the dash cam, what you see is the plaintiff turning onto the east side of fifth, not walking across fifth, and, and, and then, and then turning. But the violation was for those five or six seconds? I, I think it's more like eight or nine, and that he starts to turn . . . Less than ten seconds. So, are people getting arrested all the time in Texas? I, I don't think, I don't . . . Your Honor, the answer is no, and . . . They all go right up to the corner? Um, I, I, I, if you will read the declaration of, of, of Officer Cantu, his thought in this case, what he was, he was just going to talk to the plaintiff about safety issues. Okay. He wasn't going, that he, he wasn't going to give him a ticket, he wasn't going to arrest him. It, it, it was, it, it's the, it's the attitude, it's the recalcitrance, it's the dismissiveness, it's the argumentativeness in, which, which, which escalates this.  And, and, and, um . . . So, it was such a minor offense that it wasn't even going to get a ticket, but that gets you into difficulty under excessive force. If, if you're saying, and I appreciate the candor, that he wasn't even going to cite him, then it makes, when we start to apply the Graham factors, you've got no offense really, not even a citable one, much less not going to arrest. Your Honor, only wanting to talk to somebody about a safety issue . . . That's important. I agree. That is a violation. True, but what's the basis to take down then? Is it because he didn't like his reaction when the guy's saying, what are you talking about? Your Honor, he has probable cause to arrest him. The, the, the, the, the video is clear that he has probable cause to arrest him. Now, a police officer has discretion and that's, it's not like a warrant where you have to take them into custody. You, you, you, just like in a, in a traffic violation situation, an officer may give you a warning. Take me through the Graham factors. The, the . . . Was there a severe crime here? There was not, Your Honor. Okay, and was, there's no flight? The, the, I, I, I would beg to differ a little bit . . . Yeah, yeah, no, do differ, don't even beg to, do differ. I, I . . . You think by stepping back he's fleeing? I, I, exactly. The, the plaintiff in this case twice waves goodbye like he is leaving, backs up several steps and then on the last occasion actually turns to leave and that's when you can actually see the police officer come into the, the, you, you first see his gloved hand and then you see the rest of the police officer come forward and it, it is that second time that the, that the plaintiff says, I'm out of here, that, that with, with, with the wave and, and, and the backing up, you know, so leaves is a single step. The, the, so, so leaves is a . . . Or is he just handcuffing? One . . . It was evident it's broad daylight, it's broad daylight. I mean, it's evident, at least he doesn't have a weapon, he doesn't have a stick, he doesn't have anything. He is admittedly loud, you know, he's flustered because he's been stopped. Yeah, yeah, yeah, I get what you're saying, but there's nothing I saw. I mean, there's even an attempt to handcuff or put your hands out so I can cuff you and the guy refused to do that, then he takes him down. All I saw was he goes from, the guy slips away, immediately to slamming him to the ground and he says, you've broken my hip, my arm's been broken before, you know, the three people that had him on the ground and it does go wild. I mean, not that he was calm, but I mean, it just, to go from he wasn't gonna give him a ticket, he declines to come to him, he moves away, to just suddenly slam to the ground with not even, come over, put your hands behind your back, put your hands down, I mean, even on TV, they do that. I mean, it just goes to boom, he's on the concrete and it just . . . Your Honor, he . . . Am I missing something? I think so. Okay. The officer did attempt to grab his wrist and what the officer says in his declaration is, and I think you see this, that Mr. Martinez pulls it away and he also raises the other hand. And at that point in time, and you can see that in the video, especially if you slow it down, so at that point in time, he thought that he was going to, that he would better be able, for the safety of everybody, to get him handcuffed on the ground. And what you see in the video is a hand . . . Once again, you've got to slow it down and you've also got to read the declaration of Cantu, I think. He's got a hand on his chest and he's got a hand on his shoulder and he takes him to the ground in actually a fairly controlled manner. If this was a, if we were looking at whether or not that this is roughing the passer, I don't think you would find that it was. He doesn't come on . . . Oh, yeah, that'd be a flag. I . . . Oh, yeah. Well, maybe for Mahomes . . . All the stripes . . . Maybe for Mahomes, but not for Josh Allen. Every striped official, including the back judge, would throw a flag. You'd better find another, find another example. I disagree. I think he brings him to the ground in a fairly controlled manner and at that point in time, it is only open hand control. There is not a punch. There is not a strike. There is not a kick. There is not a . . . Aren't those fact issues? No, Your Honor, not in this case. Not in a situation where there is not a declaration of the plaintiff saying that he struck him, not in a case where we have a declaration from the officer saying what he did, and not in a case where we have a video. The . . . From the moment he goes to the ground, this is straight open hand compliance. Your dissent, Your Honor, in Tucker v. Shreveport, in which you said that there may be fact questions in a case in which the encounter with the police is extended and brutal, well, this isn't that case. You said that there should be a fact issue in a case in which someone is prone and surrounded and someone endures repeated strikes and kicks. Not this case. There was not a strike, a kick, a punch, a blow, a pain compliance blow, or a tase. This officer and Officer Don Diego, when he got there, they did exactly what we're asking them to do, and it's not elegant. It is . . . I was here on a dog bite case earlier last year, and it was a case where a person wasn't even under arrest. It was a community caretaker function, and I thought at that time that I wish that there was a machine that a police officer could point at somebody and put them in a bubble, and we then are able to transport, get them to medical care in this instance. In this case, we've made the decision that I've got probable cause to arrest you with your attitude. I am going to arrest you at this point. I wish there was a machine that he could point a weapon and put him in a bubble and get him into the police car and go through the arrest process. We do have cases, you're right, Tucker is, of course, we have to focus on the majority, but even Solis, which you cite quite a bit. Those are traffic offenses, and I know Tucker, at least, was at nighttime, and Solis, the concern is intoxicated driver. To me, on the Graham scale, that's much more severe than a jaywalker. Solis, I actually had the city on Solis, so . . . It was an intoxicated driver, and there wasn't really a takedown. Solis, she starts to fall when they're trying to cuff her. Your Honor, there was . . . She wasn't the driver. She was passenger only, and it was public intoxication. I've got two other cases for you. Okay. What's your best case? You can see intoxication offenses with cars, police, that's a more serious offense to me. Likewise, nighttime driving for a long time, as in Tucker, when he keeps driving lights on. Here, it's jaywalking. I mean, disagree with me if I'm wrong. It is someone who doesn't get to the corner by nine seconds. That sounds like a non-offense. Well, it's not a non-offense. But I mean, as I understand qualified immunity, it's we defer to cops in these split-second moments when they might have a dangerous situation. Courts aren't going to second-guess that. This was Officer Cantu initiating a jaywalking offense. He's driving, and he watches a guy take nine steps on the wrong side. He confronts him. No weapon. No threat to the officer. Obviously, no threat to anyone else. So you're saying it's a safe . . . He wants to talk to Martinez about, you've got to be a little safer, because at that point, you can't see the cars coming. And then it's a takedown. But when . . . the dismissiveness, the argumentativeness, the recalcitrance, and that's talked about in Craig v. Martin. So you'd ask for my best case, and I'm not going to tell you Tucker, because you were on the dissent in that case, but Tucker was far worse from a use-of-force standpoint. It was far worse in force. But Craig v. Martin . . . You've been on that panel with me. Craig v. Martin and Betz v. Brennan, Your Honor. And by the way, these two . . . Well, slow down a little. You've just given us your two cases, Craig v. Martin . . . And Betz v. Brennan . . . Those are both in your briefs, right? Those are both in the brief, and they're both cited in the Solis opinion. And one of the things that my friends . . . Are those offenses that are as minor as a pedestrian jaywalking? Yes, Your Honor. And they involved full takedowns? Yes, Your Honor.  And my friends on the other side have talked about in this case that those cases occurred after the incident. Well, the Solis incident occurred in May of 2019, and Martin has occurred in February of 2019, about three months before. And what Solis said about those after cases, quote-unquote, is that although Tucker, Craig, and Betz . . . And I would now add Solis to that list. Were decided after the incident, they demonstrated that as of May of 2019, the constitutional question at issue was far from, quote, beyond debate. If the law wasn't sufficiently clear to deny qualified immunity in those factually similar cases, it follows that no clearly established right exists here. What do you do about trammel? Your Honor, trammel ended up with a knee strike, a headlock, a takedown, more knee strikes, and to the point where the person's back was fractured. We don't have a medical record, a medical bill, a medical provider. We don't even have a declaration from the plaintiff saying that he was hurt. Well, that's because we've got a video that he's screaming in pain all the way to the hospital, and we see them giving him opioid pain medication. Well, Your Honor, he says his hips are broken, and he then proceeds to kick the crap out of the police car. No, but you're saying no injury, and I'm saying don't we have video conclusive proof that he has administered pain medication? I know that we have video that he has declared fit for jail, and they— You're not sure if, when the video shows that he's actually given an opioid. I do not know that. If he were, you'd agree that's easily sufficient injury. If doctors have to give you pain medication, they don't just do that. Does it get you to pass de minimis, pass the AEDNA versus Tarver de minimis, to that it may be compensable? Well, maybe, but then, in terms of where we're left on the sliding scale, it is way downhill. So Lee's talks about a sliding scale of injuries, and that if we have a slight injury, it's going to tend to make us think that the force was reasonable. Well, here, yes. He is not admitted. He is declared fit for jail, and he is released, and then we don't have a medical record, a medical bill, a photo, or anything else. You're saying sort of start to finish, he's screaming in pain, and the police themselves thought they had to take him to a hospital, and then the physicians themselves thought he had to get pain medication. That sounds like injury to me. It is a policy that if someone claims an injury, they take him to the hospital. But, Your Honor, he struggles with the police officers with his hands, with his shoulders, with his arms, and kicks the crap out of the police car when he is placed in the inside of the police door when he's placed inside. I mean, I think you can draw just as many inferences from the video after that that he's not injured as you can, that he suffered any injury in this. So, trammel, knee strike, headlock, additional knee strikes, and the medical records indicated that there were L1, L2, and L3 fractures. Hanks, which a lot of times plaintiffs in this case, in these cases, want to talk about. Hanks, he was asked to do a series of things he mostly did. The plaintiff in this case did none of what he was asked to do. And on the last one, he was asked to get on his knees. He hesitated, and a blow was administered to his back and neck sufficient to knock him onto the hood of his car. And the panel in that case actually talked about the extreme degree of force used. And so, I believe that Hanks and trammel are absolutely distinguishable, and that this case falls within the Craig v. Martin, Betz v. Brennan, Solis v. Serrett line of cases. This is what we're — Can you assume from the exchange that these officers know him pretty well? He's pretty acquainted with them? Yeah. Cantu did not, but the rest of them did. Sergeant Torres knew him. He is a frequent guest of the Rosenberg Police Department. Always because of the 552? No, no, no, Your Honor. No. And it's not in the record, but no. There's other issues. Don Diego is the one who joins. Don Diego is — Speak to him and buy him your liability? Your Honor, Don Diego — I mean, Don Diego is not there if we're going to be mad at Cantu for anything. And I don't think we should be. I think he did it right. But if we're going to be mad at him for anything, it may be the abrupt takedown. Right. And Don Diego wasn't there for it. And so, all Don Diego does is arrive and help get him handcuffed. We're talking about two officers who did it right. We are so often here talking about a strike, a blow, knee strikes, a tackle. We're talking about two officers who did it right. He did make the decision, Officer Cantu did make the decision that I am going to arrest him because of his attitude, which I've got the right to do under United States Supreme Court precedent in Atwater. Technically, maybe so. But the decision then is the takedown, the sort of flip to the sidewalk. He goes right — is there a sidewalk? There's no sidewalk. I don't think so, Your Honor. It's on the road. It's sort of — it's kind of a gravel parking surface. But I will tell you that police officers — and you see this a lot — they are more comfortable fighting on the ground than they — and it — once again, it's not elegant. It's not elegant. But it is — You don't that often — you're in New York City, you see a lot of jaywalkers. I've never seen — I've never seen people thrown to the sidewalk for the jaywalking. It's the — it's the force vis-a-vis the offense that's sort of startling here. He — once again, the one thing that I would — I know I'm out of time, but I'll — if I could finish this sentence. The — if you will read Officer Cantu's declaration and watch the video, he reaches for the wrist. It is his preference to handcuff him, peacefully standing up. He is not allowed to do so. I mean, you know, it won't dispose of the case, but I mean, there's a lot of stuff that's striking. I mean, officers are taught to have thin skins, you know, in terms of belligerent people, because frequently most people are not happy to be arrested. And then the fact that, as you candidly acknowledge, which we appreciate, they knew who he was. I mean, they'd had other encounters with him to a degree. So when you — I'm reading this video, his response back to him is kind of that. Look, you don't have to answer. I'm just saying in looking at it, his response back, he doesn't want to come back. It's kind of like, oh, no, you know. And as you said, if there are other stuff, I did something, but this time I didn't do nothing, so you're messing with me. And that's kind of how that whole dialogue goes, which you sort of supported by the fact that they kind of know who he is. And that just begs the question, but it is striking. But the point, the worst part is the takedown. I mean, if it's Jaywalking, this is some guy, you know he's going to do something else some other time, leave him alone. Here he doesn't move back, and it goes from the handcuffing to the brutal takedown. He says he's heard it on and on and on. But I guess my takeaway, officers are trained to resist the profanity, you know, all that sort of stuff. And it looks like that may have been what precipitated it. The case may ultimately absolve it, but officers are taught to have thicker skin because people may be belittling and that not precipitate here, broad daylight, you know, takedown a guy, whatever else he may have done. So the videos are hard to look at, frankly. Can I say two things in response? One, Cantu did not know him. Cantu was a newer officer and had not had . . . And second, the case law says that we do not look at subjective intent. Oh, I understand that. I said what I said may not be dispositive, but I'm just responding back to what you're  If you have all this context and all this other stuff, you know, we look at the videos, which we're glad to have a dash cam to show, but they show a lot, you know, in terms of the full context of it in a jaywalking situation. The case may turn out that way, but just allow for the fact, you know, we're not naive here, you know, what we see there. So anyway, that's it. You've exhaled your time, and you've responded ably on behalf of your client. Thank you. All right, let's see your back. May it please the Court. So a number of points on rebuttal. I guess I'll start with the . . . Why don't you just start with, I mean, my sensitivity to the video doesn't get you home. You still got to do what you got to do, so why don't you hone in on how you get there, particularly vis-a-vis, you know, the qualified immunity piece? I mean, it's there. Right, and yeah, that's where, you know, I think it dovetails really nicely into talking about Trammell and talking about Solis. So in Trammell, the Court said, you know, irrespective of what injuries the plaintiff ended up with in Trammell, the point is what the clearly established law is. And what Trammell said in 2017 was that it, quote, is clearly established that it is objectively unreasonable for officers to tackle an individual who is not fleeing, not violent, and not aggressive. And they said that that's been established, clearly established, since at least January of 2013. Well, the opposite says they attempted to . . . he wanted to handcuff him, and he pulled his hands away, and so on and so forth. I don't know. So . . . Right. Wouldn't the law allow them to take him down if he's non-cooperative in terms of a handcuffing? So what I'd say to that is I think that that's a pretty . . . I don't agree with that interpretation of the video. So first, I would agree with Your Honor that there would be a flag on the plate for wrapping the passer. And I would encourage the Court to go back through the video. It's three seconds. So the time stamp in the bottom corner is . . . To answer his question legally, let's assume it's open to a single officer thinking there's resistance. At that point, is the law sort of murky as to whether you can take down one cop, one person resisting? Or is the law still clear? I would say that the law is still clear in that instance that the takedown was not justified purely because of the speed of the escalation. So it's three seconds from the first contact. And again, I would encourage Your Honor to slow down the video and look at it. The time stamps are 436.20 to 436.23. So it's a very short three-second window. And the initial grab is to the upper arm. I reviewed it this morning. I mean, it was more to the upper arm. It wasn't to the wrist trying to handcuff. And he said, you know, what . . . I forget exactly how my friend on the other side phrased in terms of where the officer's hands were when he conducted the takedown. It was basically cross-body. Whether or not the hands were touching is kind of relevant. But he kind of bear-hugged him around the chest and spun him and took him down. Remind me, he's never told, stop, I'm arresting you? Correct. And as Your Honor's . . . Wasn't aware what he was supposed to do? Is that it? That's exactly correct, Your Honor. And as Your Honor's discussed with my friend on the other side, he wasn't even going to arrest him. There was no . . . It was just going to be, evidently, a safety briefing. And, you know, this wasn't originally a detention. And it escalated apparently due to his argumentativeness and dismissiveness. But verbal candor is not a factor in whether or not to escalate force. Nor is it really a factor in whether or not to arrest in the first instance. And appellees, excuse me, have not cited any cases where purely Mr. Martinez's verbal candor would subject him to arrest in this instance. Tell me before your time's out on the two cases, Gregg and Betts, other than just saying those are too late. Could you . . . He cited two cases, not Solis, getting away from the Solis-Trammell spectrum. He cited Gregg v. Martin and Betts v. . . You're familiar with those two cases? Yes. Okay, how do you distinguish them without just saying, oh, they came after the incident? How would you distinguish them on the merits? I mean, I think the biggest thing with that is, again, the biggest factors here are both the speed of the escalation and the lack of threat at all. I mean, there's . . . When we look at them, they won't have those two elements. That's your answer. Yeah, I mean, to the extent . . . At least not to the extent that this case has. I mean, there was no threat presented by Mr. Martinez at all. He had an obvious deformity in his hand. And again, this is not the record, but he is missing basically the bone in his . . . I believe it's his left forearm, whichever forearm it is, or the significant portion of the bone. So, I mean, it's a significant injury that you can see in the video. He's holding his hand, and it's not correctly shaped. What significance, if any, do you attribute to Mr. Martinez' rather vigorous verbal pushback on the officer? Does that factor in? We don't go to subjective intent, but does that factor into the takedown or anything else, or it's totally irrelevant? Legally, Your Honor, I would argue that it's totally irrelevant. And I have cited a case to that effect that I can pull up for you, Shoemake v. City of Adrian. That's a Sixth Circuit case, 44 F. 4th, 427. And the other thing that I would note, too, is this discussion of profanity and how thick of a skin an officer should have. He didn't use any profanity before he was taken down. That's thing number one. And thing number two is it shouldn't be correct. It shouldn't be officers doing the right thing when, just because they're disagreed with, they decide this is going from a safety briefing to an arrest without really making that clear in any way. So thank you for your time, Your Honors. We ask that you reverse and remand. Thank you. Both counsel appreciate the briefing and argument in the case. We'll take it on its own.